AO 91 (Rev. 11/11) Criminal Complaint

~~ORIGINAL~~

# UNITED STATES DISTRICT COURT

for the

Central District of California



| | |
|---|---|
| United States of America,<br>v.<br>PEDRO HERNANDEZ-GOMEZ,<br>Defendant. | Case No.<br>20MJ00080 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 7, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Poss. with Int. to Dist. Cont. Sub. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Sworn to before me and signed in my presence.

Date: 1/8/20

_____
Complainant's signature

Jason C. Van Bennekum, ATF Special Agent
*Printed name and title*

_____
Judge's signature

Hon. Patrick J. Walsh, U.S. Magistrate Judge
*Printed name and title*

City and state: Los Angeles, California

AUSA: Kevin Reidy – 213-894-8536

**AFFIDAVIT**

I, Jason C. Van Bennekum, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Pedro HERNANDEZ-GOMEZ ("HERNANDEZ-GOMEZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search one digital device (the "SUBJECT DEVICE"), in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in Glendale, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

1

is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been an ATF Special Agent for more than 15 years. During this time, I have investigated violations of federal statutes governing firearms, explosives, and narcotics. I have also investigated violations of state firearms and narcotics laws. I have assisted in the execution of more than 75 state and federal search warrants. I have also conducted surveillance of individuals committing crimes of violence, individuals trafficking in firearms, individuals trafficking illegal narcotic substances, prohibited persons in possession of firearms, and persons possessing illegal firearms. I have also interviewed confidential informants, cooperating witnesses, criminal defendants, and other persons engaged in violations of federal firearms, robbery, explosives, and narcotics laws. Prior to my employment with the ATF, I was a United States Border Patrol Agent for 8 years.

## III. SUMMARY OF PROBABLE CAUSE

6.   In December 2019, an ATF Confidential Informant (the "CI") communicated with an individual, "NETO," via WhatsApp text

messages and voice calls to set up a deal in which NETO would provide narcotics in exchange for firearms. On December 19, 2019, "NETO" and the CI arranged an in-person meeting to take place the following day in Los Angeles, California, with "NETO's" associate. On December 20, 2019, HERNANDEZ-GOMEZ called the CI and told him that he would be crossing the border for the meeting later that day. HERNANDEZ-GOMEZ then met with the CI and an undercover ATF agent (the "UC") at an ATF undercover location equipped with video and audio recording devices (the "UC Location"). During the ensuing recorded interaction, HERNANDEZ-GOMEZ took pictures with his cell phone of the firearms that the CI and the UC offered for sale and placed phone calls to NETO to allow NETO to negotiate the firearms/narcotics exchange with the CI and the UC. Ultimately, "NETO" agreed to provide 8 kilograms of heroin and 10,000 fentanyl pills in exchange for various machine guns, rocket launchers, grenades, and handguns. HERNANDEZ-GOMEZ stated he would return to Los Angeles on January 7, 2020, to deliver the drugs and pick up the guns.

7. On January 7, 2020, HERNANDEZ-GOMEZ returned to the UC Location with approximately two kilograms of suspected heroin in his backpack. HERNANDEZ-GOMEZ took additional pictures of firearms on his cell phone, communicated with an unknown male, and re-negotiated the number of firearms and grenades to exchange for the heroin. HERNANDEZ-GOMEZ was arrested shortly after loading some of the firearms into his van for transport back to Mexico. The SUBJECT DEVICE was recovered from

HERNANDEZ-GOMEZ's person during the search incident to his arrest. In a post-arrest <u>Mirandized</u> statement, HERNANDEZ-GOMEZ admitted that he had picked up the drugs just before the meeting had planned on bringing the guns back to Tijuana, Mexico, had received 2,000 pesos for making the trip to the UC Location, and expected to receive 14 percent of the total price paid for the firearms.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. **In WhatsApp Conversations, the CI Sets Up a Meeting to Exchange Firearms for Narcotics**

9. In December 2019, an unknown individual provided the CI[1] with the Whatsapp contact information for an individual residing in Mexico named "NETO" who would be interested in purchasing firearms from the CI. During these communications, the CI and NETO discussed the possibility of purchasing firearms from the CI's firearms supplier (who was in fact the UC) in exchange for narcotics provided by NETO.

10. On or about December 19, 2019, NETO and the CI had a WhatsApp conversation in which they arranged a meeting with CI's firearms supplier and one of NETO's associates on December 20, 2019. NETO said that he would send an associate to the meeting

---

[1] The CI has prior arrests for alien smuggling and amphetamine sales but has no criminal convictions. He provided assistance to the ATF in exchange for monetary compensation. He has received approximately $7,800 from the ATF over the course of his career.

4

to inspect the firearms for sale and then NETO would negotiate the narcotics exchange. Later, NETO gave the CI a phone number of the person (later identified as HERNANDEZ-GOMEZ) that would meet the UC and the CI on December 20, 2019.

11. On this same date, the CI and HERNANDEZ-GOMEZ communicated by phone using the number that NETO had provided for his associate. HERNANDEZ-GOMEZ told the CI that he would coming from Tijuana and expected to arrive in the Los Angeles area for the meeting on December 20, 2019, around 8:00 a.m. The CI told HERNANDEZ-GOMEZ to meet him at the UC Location.

**B. HERNANDEZ-GOMEZ Attends the Meeting, Inspects the Firearms for Purchase, and Indicates He Will Return on January 7, 2020, to Deliver Drugs and Pick Up the Guns**

12. On December 20, 2019, ATF agents made preparations for the meeting at the UC Location. The UC Location is equipped with audio and visual recording devices that were set up to capture the meeting. Before the meeting started, ATF agents placed realistic prop firearms (including grenade launchers, machine guns, and hand grenades) in the break room area of the UC Location.

13. At approximately 9:09 a.m., HERNANDEZ-GOMEZ arrived at the UC Location in a Silver Dodge Minivan, California license plate 7CNT289. A check of the US Customs and Border Protection Vehicle Encounter Detail revealed at 4:05 a.m. the above vehicle crossed into the United States, from Mexico, through the San Ysidro Port of Entry. The vehicle had one passenger identified on the report as HERNANDEZ-GOMEZ. I reviewed photos of the vehicle crossing and they show HERNANDEZ-GOMEZ and his minivan.

14.  HERNANDEZ-GOMEZ entered the UC location and met with the CI and the UC.  HERNANDEZ-GOMEZ spoke primarily Spanish and the CI, who speaks both English and Spanish, translated the conversation for the UC throughout the meeting.  The three entered the break room where multiple firearms, including fully automatic rifles, semi-automatic pistols, and a M203 grenade launcher were arrayed on tables.  The UC discussed the prices of the various firearms and that the cost would depend on the quantity ordered and if any ammunition was required.

15.  During the meeting, HERNANDEZ-GOMEZ took out his cellular telephone and took pictures and videos of the various firearms displayed.  HERNANDEZ took particular notice of a .50 caliber handgun and indicated that he had shot a similar firearm in Mexico.

16.  The UC asked what firearms HERNANDEZ-GOMEZ would need and told him he would need to come to the UC location to pick them up.  The UC then asked if HERNANDEZ-GOMEZ would be able to exchange narcotics for the firearms.  HERNANDEZ-GOMEZ said he would need to check with Mexico.  HERNANDEZ-GOMEZ later said that he would be the person that would be coming to pick up the guns and that he would be probably bring another person with him because he recently got off federal probation.  HERNANDEZ-GOMEZ explained he previously transported firearms to Mexico in his van.  He said for this shipment he may need an additional vehicle.

17.  The CI then placed a call to NETO and kept his phone on speaker.  During the call, HERNANDEZ-GOMEZ took additional

6

photos and videos of the firearms on his phone. NETO asked the CI and the UC how soon they could get the firearms. The UC explained as soon as he knew how many and what type he could give a time.

18. NETO stated he wanted 10 of the Bushmaster, XM-15 machine guns with attached grenade launcher, 4 of the SACO, MK, 43 machine guns, 2 cases of grenades for the grenade launcher and 20 Glock handguns and ended the call. The UC, the CI, and HERNANDEZ-GOMEZ used their cellular phone calculators to come up with a final price of $143,200.00 for the firearms NETO wanted.

19. The CI later placed another call to NETO utilizing the speaker phone. NETO told the CI that he would provide 7 kilograms of heroin and 10,000 fentanyl pills in exchange for the firearms. HERNANDEZ-GOMEZ then showed the UC a photo (on his cellular phone) of a Barrett, .50 caliber rifle that NETO wanted. NETO instructed the CI to "Google" the type of firearm that he wanted. The CI showed the UC a picture of an ARES, Defense SCR. 5.56 caliber NATO rifle and said NETO wanted two of them. The UC stated that the price would be $3000.00 to $3500.00 each and that the Barrett, .50-caliber rifle would cost $20,000.00. NETO stated that he had purchased a Barrett, .50 caliber rifle for $12,000.00 and wanted one of them. The UC then told "NETO" that he would provide the rifle at a price of $15,000.00. The UC then agreed to provide all the firearms in exchange for 8 kilograms of heroin and 10,000 fentanyl pills.

20. After the call with NETO ended, HERNANDEZ-GOMEZ stated he would need another driver because he is used to only

7

transporting smaller firearms to Mexico. HERNANDEZ-GOMEZ said he wanted to transport the firearms on either January 6 or 7, 2020, because it was too "hot" at the border at the current time.

21. HERNANDEZ-GOMEZ stated he used to work for NETO's father but got arrested six years ago and had to serve three years in prison in Lompoc, CA.

22. The meeting concluded and HERNANDEZ-GOMEZ left the UC Location. Just before he left, HERNANDEZ-GOMEZ asked the CI for gas money for the return trip to Mexico. The CI provided HERNANDEZ-GOMEZ with $100.

C. **HERNANDEZ-GOMEZ Returns to the UC Location with 2 Kilograms of Heroin and ATF Agents Arrest HERNANDEZ-GOMEZ and Find the SUBJECT DEVICE.**

23. On or about January 6, 2020, the CI placed a phone call to HERNANDEZ-GOMEZ using the number that NETO had provided. During the phone call the CI and HERANDEZ-GOMEZ agreed to meet the following day at the UC location to exchange heroin for firearms.

24. On or about January 7, 2020, the UC and the CI met HERNANDEZ-GOMEZ at the UC Location. The meeting took place at an undercover location and was audio and video recorded.

25. HERNANDEZ-GOMEZ arrived at the UC Location at approximately 3:08 pm. HERNANDEZ-GOMEZ was driving the same car that he drove to the December 20, 2019 meeting at the UC Location - a Silver Dodge Minivan, California license plate 7CNT289. HERNANDEZ-GOMEZ exited his vehicle then returned and retrieved a green backpack form the vehicle. The UC and the CI

8

asked HERNANDEZ-GOMEZ to park his vehicle inside the UC location.

26. HERNANDEZ-GOMEZ drove into the UC Location and exited his vehicle carrying the green backpack. HERNANDEZ-GOMEZ walked with the UC and the CI to the break room of the UC Location. Prior to HERNANDEZ-GOMEZ arriving at the UC Location ATF Agents staged multiple "prop" firearms inside the break room. These firearms were present to use to exchange for narcotics. Among the firearms were fully automatic rifles, grenade launchers, handguns and prop inert grenades.

27. Inside the break room, HERNANDEZ-GOMEZ handed the backpack to the CI and the UC. The UC opened the backpack and took out two bricks of a substance containing suspected heroin wrapped in tight plastic wrap. When only two bricks (believed at the time to weighing 1 kilogram each) were taken out of the backpack, HERNANDEZ-GOMEZ placed a phone call, on speaker phone to an unknown person to inquire why the remaining kilograms were missing. Previously it was agreed 8 kilograms of heroin and 10,000 fentanyl pills would be exchanged for the firearms. The CI spoke to the unknown individual on HERNANDEZ-GOMEZ's phone about the quantity delivered.

28. The UC stated that he would need to adjust the amount of firearms HERNANDEZ-GOMEZ would receive based on the amount of narcotics delivered. The UC weighed both bricks on a scale in the room and each weighed approximately one kilogram.

29. The UC stated he would be willing to exchange two cases of the grenades for two kilograms of suspected heroin.

9

HERNANDEZ-GOMEZ received a text message and asked if he could get less grenades in exchange for firearms. The UC said he could have four of the fully automatic rifles with attached grenade launchers and one case of grenades for the two kilograms. HERNANDEZ-GOMEZ then took photos of the grenades on his cellular telephone. The UC explained to HERNANDEZ-GOMEZ how the grenades work. HERNANDEZ-GOMEZ said they were going to used on a vehicle.

30. HERNANDEZ-GOMEZ while texting on his cellular phone, stated he was attempting to get more narcotics. HERNANDEZ-GOMEZ asked how many grenades were in each case. HERNANDEZ-GOMEZ showed the CI a text message that said they wanted four rifles. The UC, the CI and HERNANDEZ-GOMEZ then carried three rifles and a case of the grenades to HERNANDEZ-GOMEZ's minivan.

31. HERNANDEZ-GOMEZ loaded three fully automatic rifles into the rear seat area of his minivan. HERNANDEZ-GOMEZ then placed the case of grenades in the rear of the minivan.

32. The UC, the CI, and HERNANDEZ-GOMEZ then returned to the break room. A short time later, ATF agents entered the break room and arrested HERNANDEZ-GOMEZ. At the time of his arrest, HERNANDEZ-GOMEZ was holding the SUBJECT DEVICE that he had been using throughout the meeting. After the arrest, ATF agents recovered the two plastic-wrapped packages of suspected heroin and the green backpack HERNANDEZ-GOMEZ was carrying from the break room.

33. During a search of HERNANDEZ-GOMEZ's minivan, ATF agents recovered a United States Passport in HERNANDEZ-GOMEZ's name.

**D.  Criminal History**

34. On January 6, 2020, I reviewed certified conviction documents for HERNANDEZ-GOMEZ and learned that HERNANDEZ-GOMEZ has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year: on or about October 24, 2013, HERNANDEZ-GOMEZ was convicted of Possession with Intent to Distribute Heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), in the United States District Court for the District of Arizona, Case Number CR 13-00863-0001-PHX-DGC.

**E.  Drug Test**

35. On January 7, 2020, I conducted a field test of one of the plastic bricks and narcotics and found it tested positive for heroin.

**F.  HERNANDEZ-GOMEZ'S Mirandized Statements**

36. On or about January 7, 2020, after orally being advised of his Miranda rights in Spanish, HERNANDEZ-GOMEZ agreed to speak with law enforcement. HERNANDEZ-GOMEZ stated that he had been paid 2,000 pesos to make the trip to the UC Location and was expecting to be paid 14 percent of the total sale price of the firearms upon delivery.

37. Additionally, during preliminary questioning to elicit biographical information, HERNANDEZ-GOMEZ stated that his telephone number was the same as the number NETO provided for

his associate and the number that the CI had been using to arrange the December 20 and January 7 meetings with HERNANDEZ-GOMEZ.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

38. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

  39. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

13

   b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

40. As used herein, the term "digital device" includes the SUBJECT DEVICE.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    42.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

43.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

    c.  The person who is in possession of a device or has the device among his or her belongings is likely a user of

17

the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ-GOMEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ-GOMEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

44. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII. CONCLUSION

45. For all of the reasons described above, there is probable cause to believe that Pedro HERNANDEZ-GOMEZ has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Jason C. Van Bennekum,
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed to and sworn before me
this ___8___ day of January, 2020.

HONORABLE ~~PATRICK J. WALSH~~ Steve Kim
UNITED STATES MAGISTRATE JUDGE

18